Mr. Remy and Mr. Johnson, welcome to the Fifth Circle. You're our last case for the day, so we're glad to see you. Thank you, your honor. And uh, I'm judged to this together with Judge Umar and Judge Fitch, the panel in this case. This is uh, of course, uh, first names from Captl, S-3 Pump Svc, Incorporated, and number 20-30372. So we're all identified. Mr. Remy, I believe you're first. You may begin. Thank you. Good afternoon. My name is Robert Raley. I'm getting some sort of feedback here. Court will bear with me just one second. My name is Robert Raley. I'm the attorney for First National Captl LLC, the appellant in this case. This is an appeal from the United States District Court in the Shreve Court, sitting as an appellate court, reviewing the bankruptcy court's summary judgment that was rendered in favor of S-3 Pump. The standard for review is discussed at pages 10 through 12 of FNC's Principle 3. Between February 13, 2012 and November 26, 2013, FNC provided S-3 Pump with acquisition financing for 19 frac pump units. 15 of those transactions are the subject of S-3 Pump's adversary proceeding complaint, which is now before this court on appeal. The parties entered into equipment agreements, and according to the master lease agreement, multiple lease documents are to be utilized in connection with entering into the equipment financing arrangement. Additionally, Texas law recognizes that it can be appropriate to consider multiple documents as one contract or agreement. The lease documents that we need to examine first are the approval letters and schedules. Mr. Raley, let me interrupt you at this point. The master lease and the schedules don't contemplate or even refer to the approval letters or letters of intent. The lease language is quite clear with contractual interpretation that if any term of a schedule conflicts or is inconsistent with any terms of the master lease, the terms of the schedule govern, and that's repeated again in the schedules. That seems pretty unambiguous to me. Can you tell me how outside documents that are foreclosed by the master lease agreement and the schedules suddenly come in and try to chip away at that? Respectfully, Judge Hicks, I disagree with your premise. We have to look further into the master lease agreement. If we look further into the master lease agreement, we see at paragraph two under the definitions a definition for lease documents. Lease documents are documents that are prepared, that are related to or in connection with the lease, that are prepared by the lessor and signed by the lessee. Then we have to look at paragraph 28, which tells us that to see the parties understanding in their agreements, we consider the lease and all lease documents. Then we have to look at paragraph 23d, which says that the lease and all lease documents are enforceable. In this instance, how do you get around that simple language that the term of the schedules govern? I don't understand how you try to take an unambiguous term like that and then say, oh, all these other little documents and letters of intent and approval letters that are not contemplated specifically as modifying anything without the lessor's agreement and consent. How that suddenly modifies those schedules and the master lease agreement. If you look carefully at paragraph one of the master lease agreement, the master lease agreement talks about a schedule becomes a lease. It talks about at that point, it incorporates the provisions of the master lease agreement. Then it says that if you have a schedule, then the schedule governs. It's not talking about a conflict between a schedule and another lease document. That's clearly limited by the language in paragraph one to a conflict between the schedule and the master lease agreement. Let me ask you if we could approach it maybe a in relation to the date, let's say, of the letter and the schedule. The letter, as I understand, it comes before the schedule. Correct me if I'm wrong. And then at some point, the equipment is delivered. Explain how that transaction is a practical matter unfolded so that we now have a schedule with a letter, although in three circumstances, I don't think we have one. And then we have equipment that's on site. The first step is, in the very beginning, is a letter of intent. As the process unfolds, there is an approval letter that's sent to S3 Pump. It's also sent with an invoice for a deposit of the last 49th and 50th payment. S3 Pump approves the approval letter, signs it, sends it back with the deposit. At that point in time, S3, excuse me, FNC starts continuing with the processing and delivery of the equipment. Then within approximately two or three or four weeks, the equipment gets delivered. One of the documents that accompanies the, I believe, the schedule when it's sent back is an acknowledgement of delivery. So it's right there, one, two, and three, and it's pretty much simultaneous. I'm sorry, did I leave out? Where in the record? Is that something that's set forth in the record at some specific point? I believe in the record, and I'm sorry that I can't tell you where it is. There is the documents, some of the documents that are attached to one of the schedules that includes some of the other documents, which are some more other lease documents. All right. Is there any reason why three of them don't have the approval letter? There's not a good reason except I can say this. Those three transactions were executed immediately following a second letter of intent. The second letter of intent only relates to February 2013? Yes. Okay. And so my view is that that was an offer. It was accepted by act and conduct by FNC, and it processed it, and the schedules relate and interact with that, and I think it has the same result as I'm advocating for the equipment schedules. And the approval letters. Actually, I don't know. I was never able to know why there was no approval letter. But FNC doesn't see any, well, does either party, I guess. Is there any issue as to any of these transactions being treated differently from one another? All of the subject transactions were treated exactly the same. For our purposes on appeal, they should all be considered to be the same mechanism. Yes. The approval letters and the schedules are identical with the exception of the identity of the equipment and market-related terms that vary a little bit, financial terms. Any other questions? Well, let's get on to the 49th and 50th month. How were those payments handled? You mentioned earlier that that was paid by S3 when they received the letter, that they would pay the two months, and the documents describe those as the rent for months 49 and 50. How was that money treated by FNC upon receipt? When that money was received by FNC, it was held by FNC. The FNC went on engaging and expediting, actually obtaining the equipment, getting the equipment delivered. And then upon that point, it sent the equipment schedule to be executed. The equipment schedule calls itself, it designates, it has three parts to it. One of the parts, it calls it invoicing terms. And from my view, it invoices the debt that is left at the time the equipment schedule is executed. The deposit was applied to the 49th and 50th month, so when the schedule was signed, it invoiced 48 months left with no in the beginning. S3 pump just has asserted that, hey, we got these equipment schedules and they said we're going to have a 50 month term and this deposit is going to be applied to reduce it. And then lo and behold, we get these schedules that say it's a 48 month term and no deposit. Well, isn't that wonderful? Give us our deposit back. And that didn't happen until like three months ago. Well, I guess I'm a little unclear from the briefing whether, I mean, the whole point is that S3 is claiming that that money was held as a deposit to be used for its benefit. Assuming all went well and everyone was successful and happy, they would have the equipment for a total of 48 months and then would not pay months 49 and 50, but could continue to use the equipment. At that point, maybe they own the equipment, if I'm not mistaken, but that money would be for S3's benefit ultimately, wouldn't it? The money was for S3's benefit and it was applied to the 49th and 50th lease term in the front end. Let me say this, if I may, in S3 pump's brief, it discusses the first three transactions and it discusses those first three transactions and says, hey, they did it right this time. What happened was we had the lease and they applied it to the 48th month and there's only 47 months left. Well, to be clear, not to interrupt you, but it does say the last two months. I said 49th and 50th, but doesn't it say the last two months? It does. Okay. Whether it's 47 and 48 or 49 or 50. That's absolutely correct. I was just simply saying this is my view in the brief S3 pump acknowledged that the right way to handle that, the correct way to handle that was you can go and we see that the assignment doesn't include that. It was applied and the amount of sign was reduced. As a matter of fact, one of the points I made is in connection with approval letter number four and schedule number four and five, the S3 pump explicitly executed and acknowledged an assignment and they explicitly ratified the treatment under the approval by acknowledging that, hey, there's 48 months left and that's after application of the deposit. All we have left to pay is this 48 months and we have no obligation to the assignee or the assignor. Not only in my view did that acknowledge the terms of those particular transactions, what happened is we have a ratification of how this worked. Clearly in the beginning, the first two contracts under that little bit of change term, S3 pump acknowledges, yeah, I know how this works. I signed this and said this is how this works. The deposit is applied at the front before the assignment. Counsel, how do you get around the fact that it's FNC, your client, that drafted the terms of the master equipment lease agreement and drafted the schedules that contain this unambiguous language? I don't think there is anything wrong with the terms of the master lease agreement. I don't think the language in the schedules itself is necessarily unambiguous. I think you only run into a problem that could be called a discrepancy when you have a schedule when you conclude that the master lease, excuse me, the schedule is invoicing the amount, the only amount that is owed or was owed to FNC by S3 pump. The lease says, remember I said provision 23D. If you want to know what the agreement is, what the terms are, you have to look at everything. 28 says the obligations are binding. Each equipment, each lease document when executed creates a binding obligation. That's not in the equipment schedule. That's not in the approval letter. That's in the master lease agreement. I believe that the equipment schedule said this is what's owed right now. You were given credit for the deposit. That's why we're not saying you have to pay a deposit. All right. Thank you. Good afternoon. I'm Robert Johnson, counsel for S3 Pump Service Inc. I would like to spend my time today discussing two issues. The first is with respect to the 13 equipment finance sales contracts at issue, exactly what was the final contract documentation. And then the second issue is this. How can my client S3 Pump Service tell this court that it believes that first national capital after receiving 50-month preliminary agreements, preliminary approval agreements from my client, how could my client believe that first national capital would then settle for 48-month final contracts? So I'll address the first issue first. What is the final documentation here? Over the period of time of these 13 contracts throughout the preliminary documentation all the way to the closing of each of these financial contracts, all of the documentation, again, all of it prepared by first national capital, it all speaks to one and only one contract, and that is an equipment finance sale agreement, what they call a lease. But they all refer to that lease as consisting of the transition-specific schedule as well as the conforming provisions of the master agreement. Start off with the master agreement, which was the first agreement signed by the parties. The full title of that is Master Equipment Lease Agreement, and it's section 1 of that agreement. It defines the lease as the master agreement and the schedule, nothing more, nothing less. Now, as Mr. Raley points out, later in the master agreement, there's a definition of a term called lease documents, but that definition stresses the It defines lease documents as the master agreement, the schedule, and, quote, all other documents provided in connection therewith. So all of these other documents are subsidiary to the master agreement and the schedule. Nowhere anywhere in the master agreement is there any mention of an approval letter. The next, with respect to each specific transaction, the very first document was the letter of intent, and that letter of intent, in each case, defines lease documentation as the master agreement, the schedule, and, quote, supporting documentation. Again, that speaks to the subordinate role of all documents except the master agreement and the transaction-specific schedule. Now, the approval letter, which is the agreement that First National Capital stresses so much, that throughout refers to the forthcoming final documentation, and it also refers to, quote, the schedule to follow. So in every one of these approval letters, there's always a mention of final documentation consisting of the schedule, which will finalize the documentation as to each transaction. And then the final document with respect to each of these financing transactions was always the schedule, and there the schedule is unambiguous. It says that the lease consists of the schedule and the conforming parts of the master agreement. Importantly, each of the schedules also say that the initial term of each of these leases will be 48 months. It doesn't say that the remaining term after the application of the 49th and 50th months, as the approval letter refers to, it just says the entire initial term will be 48 months. That's hard to reconcile with the language of the approval letter, and it also says that the deposit will be zero. Now, First National Capital, in its brief, it asks this court to construe all of these documents as a whole, but when it asks the court to do that, it's asking the court to read all of these documents in equal weight, and that's not what the documents themselves provide. As we've just gone through, the documents, when you look at each one individual, they all refer to the primacy of the schedule and the master agreement, and we would suggest that the language in both the master agreement and also the schedule that says that the schedule controls over any conflicting provisions of the master agreement, that that also subsumes this subordinate documentation as well. I think it's clear from reading the entirety of the documentation that the schedules are designed to control over any other conflicting provisions. Now, at page seven of its brief, its initial brief to this court, I think for the first time, First National Capital says that the approval letter is actually not only an integral part of the overall unified equipment contract, but that it actually originates the debt between First National Capital and S3 Pump. It says essentially that the approval letter originates the overall debt, and that it provides for the application of the deposit as a type of origination fee, and that the schedule is only the rump of the contract for the remaining 48 months. But there's a problem with that interpretation taken by First National Capital of the contract. First of all, the master agreement and the schedule, the primary documents here, they say nothing about any origination agreement. They say nothing about any origination fee. They only refer to the lease, which First National Contract. Counsel, did your client ever respond to this, what appears to be a discrepancy? They're paid what is the equivalent of two months on the front end, and then they receive a schedule which seems to suggest that that never happened. Did your client ever say, wait a minute, we need to get credit. That's our money, and it should be applied to the account for our benefit? Well, your honor, my client believed that it was dealing with market terms when it was dealing with First National Capital, because there were other equipment finance companies apart from First National Capital that was dealing with my client, and First National Capital knew about it. There was another company by the name of Summit Funding Group that provided almost identical financial terms to what my client believed that it was getting from First National Capital, and those were 48 months terms, a two-month deposit, which would be applied to the 47th and the 48th month, and then monthly payments under this 48-month term that were nearly identical between Summit and First National Capital. Isn't there a difference in the amount though having to do with the amount of interest between the letter and the schedule? If you incorporate 50 months, the payments are going to be different than if it were to be paid in 48 months, correct? Well, actually, the monthly payment amounts between the approval letter and the final schedule did not change, but what I'm saying is that my client was dealing concurrently with another funding company, and it found, it believed that the terms that First National Capital was offering to my client under the final schedule, i.e., 48 months with a certain amount of a monthly payment, those were almost all square with the terms that my client was then paying to a competitor of First National Capital. It was paying almost those at the same time. So, my client believed that there was essentially a market term, market terms for the financing of frac pump purchases, and that there was no difference between what FNC was offering and what Summit funding was offering. In fact, my client throughout this entire period of time had a standing offer from Summit to finance the purchase of any and all frac pumps that S3 wanted to buy on the same terms that my client thought it was getting from First National Capital, i.e., 48 months and monthly payments of about the same. So, that's why my client believed that even though it may have signed a 50-month approval letter with First National Capital, at the end of the day, First National Capital, which knew who its competitors were, First National Capital did not want to lose its market share by offering terms so punitive, so much higher than what its competitor was offering, that if it tried to stick my client with the 50-month deal, my client would immediately see from the final contract documentation when it would compare notes with what it was getting from Summit, and my client would cease doing any future business with First National Capital. My client viewed the voluntary drop of terms from 50 months to 48 months as simply an effort on the part of First National Capital to retain a future business relationship with my client. At the end of the day, what caused this mess? I think it's clear that First National Capital chose obfuscation over clarity. One can't look at the documentation, all of which was drafted by First National Capital, without seeing the hands of experienced business people and lawyers that drafted its contracts. Yet, and it's a very large and sophisticated company, but if it had decided after doing the first couple of deals with S3 Pump that it wanted to introduce the idea of an origination fee, it could have easily chosen to do so. It could have used plain English in order to introduce the idea of an origination fee and allowed my client to make the business decision whether it wanted to pay that origination fee or whether it wanted to go to a readily available alternative source of financing. First National Capital didn't do that. Instead of disclosing a new origination fee, it chose obfuscation, and that led to this morass that this court's trying to untangle here today. Did your client suffer any negative financial consequences as a result of the change in the documentation? In other words, you would book it as either deposits or as expenses incurred? Well, my client, in fact, did account for these deposits as a long-term deposit, and it continued to reflect those on its books. That's an asset of the company. Had my client known at any point in time during these transactions that First National Capital had applied these as an origination fee up front, my client would have then been entitled to expense these. And actually, that would have been to my client's advantage from a tax standpoint. It would have been able to expense and thereby deduct these. That would have been a charge against its profits and lowered its tax bill at the end of the year. If my client had understood that these were origination fees, that's how it would have applied that, and it would have been to its advantage. But my client never understood that. In fact, my client continued to show these as long-term deposits, and it not did that internally. It showed those to First National Capital personnel and explained to them exactly what these were, that these were long-term deposits as shown on the books of S3 Pump. And First National Capital personnel, its auditors, which undoubtedly knew that First National Capital had already pocketed those deposits as their origination fees and that the right to use those deposits as future assets to be applied against future payments, they remained silent. They never disabused my client of what they knew, at least internally, to be inaccurate information. I do want to also point out that not only does the original but also there were numerous instances of the parties, First National Capital and S3 Pump, entering into amendments to the various contracts. Again, all of these, the amendment documentation was generated by First National Capital. And all of these amendments, they refer to the contract between the parties as the master agreement and the schedule. There's no mention anywhere in the amendments of these approval letters being in any way a part of the contract that's being amended. And likewise, invariably, First National Capital assigned its rights in these contracts to third parties to monetize that contract. And in all of these assignment documents, copies of which were provided to my client, First National Capital represents that it is assigning to this S&E its entire agreement that it has with S3 Pump. And there's no mention anywhere in those assignments of the approval letter. So, all of this led my client to further believe that the contract, the final contract that it had with First National Capital consisted purely of the master agreement and the schedule. That's what the original documentation says. That's what the post-closing documentation says. And there was nothing that S3 ever said to my client to lead it to believe otherwise. Are there any other questions that members of the court might have? Thank you, Mr. Johnson. Mr. O'Leary, you have five minutes for your rebuttal. I think it is telling that we just heard the fact that S3 Pump believed that it would receive these schedules because it did not want to enforce the outrageous terms that were set forth in the approval letters. I think we just heard an admission that S3 Pump knew that the approval letters provided for longer terms and that S3 Pump and FNC had agreed to that. And then I think we heard that S3 Pump received these interim, excuse me, these intervening equipment schedules which had a lower amount in it and so they were getting a better deal because they were concerned about losing their customers. The problem with that is we have this sequence where they signed the approval letter, agreed to the terms, and the approval letter itself, you're entering into a knowledge. We know we're entering into a binding agreement for the financing of equipment. And then they receive two or one or three of these schedules at a lower amount. You know, if it had been one approval letter and 15 or 16 schedules at a lower amount, it might make more sense. But it's just, it's not credible. It doesn't seem to me to think that S3 Pump would enter into that equipment, excuse me, the approval letter and then get the three or two or one of the schedules at a lower amount and say, hey, we've got a good deal after they paid the money and then come back later and sign it and do this over and over again. I just, I just don't think that's right. I think the use of the term origination fee is something of a red herring. The mass release agreement says that S3 Pump can assign this remaining stream of payments to anybody at any time and they don't even have to inform, they're quiet, they don't have to inform S3 Pump that they're going to assign. So they have complete rights to assign that to anybody and under any circumstances. This business about the primacy of the term, I can just say, I can't overemphasize my view of how important those paragraphs in the master lease agreement are. How unequivocally there's no way that you can read the definition of a lease agreement, I mean, a lease document and not understand that the approval letter is a lease document. In connection with paragraph 28, it says each lease together with all other lease documents constitute the entire understanding or agreement between the lessor and the lessee with respect to the leasing of equipment covered thereby and paragraph 23d provides that the lease documents when entered into will constitute legal valid and binding obligations of the lessee. S3 Pump enforceable against the lessee in accordance with the terms. Listen, paragraph 1 says that the schedules will be considered a binding lease term but paragraph 1 doesn't say that no other obligations are enforceable. It doesn't say that any obligations that were related to other documents like the rest of the master lease agreement discusses that are binding, that are enforceable, are suddenly annulled and done away with retroactively. I think that this is complicated. I think that the key to this is the master lease agreement provisions that I've been talking about and I think that's about the extent of my comments at this time. I think that the briefs filed by S3 Pump and on behalf of FNC address a lot of issues that are important issues that we didn't get to discuss today. I hope the court has an opportunity to review them. Absolutely. Let me ask you one quick question to confirm. The district court also awarded attorney's fees and interest. Is my understanding correct that there is no independent appeal of that that's not contingent on the substance of your other arguments? Is that correct? That is correct. There's not an independent appeal of that. Thank you for your arguments, gentlemen. Case will be taken under advisory. Until 1 p.m. tomorrow.